UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
MONROE DIVISION

FREDERICK CHARLES PRESTON, JR.  CIVIL ACTION NO. 25-0117

             SECTION P

VS.

             JUDGE TERRY A. DOUGHTY

NOLAN BASS, JR., ET AL.    MAG. JUDGE KAYLA D. MCCLUSKY

### REPORT AND RECOMMENDATION

Plaintiff Frederick Charles Preston, Jr., a prisoner at Catahoula Correctional Center ("CCC") proceeding pro se and in forma pauperis, filed this proceeding on approximately January 30, 2025, under 42 U.S.C. § 1983. He names the following defendants: Warden Nolan Bass, Jr., Captain Victor Smith, Lieutenant Cameron Bethel, Correctional Officer S. Neal, Lieutenant Lundy, Correctional Officer Betty Dunmore, Sergeant Burks, Correctional Officer Davis, Correctional Officer T. Harvey, Nurse D. Harvey, Lieutenant Robert Clark, and Correctional Officer Brown.[1]

For reasons below, the Court should retain the following: (1) Plaintiff's excessive force claims against Smith and Bethel; (2) his claims that Smith, T. Harvey, Davis, Burks, and Lundy failed to provide decontamination measures after Smith sprayed him with mace; and (3) his conditions of confinement claims that Smith and Bethel returned him to a cell filled with mace after spraying him with mace. The Court should dismiss Plaintiff's remaining claims.[2]

---

[1] This matter has been referred to the undersigned for review, report, and recommendation under 28 U.S.C. § 636, and the standing orders of the Court.

[2] Plaintiff does not state any claims on which relief may be granted against Defendants Bass, Neal, Dunmore, Nurse Harvey, Clark, or Brown.

## Background

Plaintiff claims that defendants at Tensas Parish Detention Center ("TPDC") retaliated against him because of a previous lawsuit he filed against officials at TPDC, including Warden Nolan Bass, Jr., and Nurse D. Harvey. *See Frederick Charles Preston, Jr. v. Pat Smith, et al.*, 3:23-cv-0324 (W.D. La. 2023). In the previous lawsuit, the Court, *inter alia*, initially dismissed Plaintiff's claims against Bass but retained Plaintiff's claims against Nurse Harvey. *Id.* at Docs. 9, 12. Plaintiff later settled his claims against Nurse Harvey. *Id.* at Doc. 41. He states that the parties reached a settlement on October 8, 2024. [doc. # 1, p. 4].

Plaintiff claims that from when he settled his prior lawsuit to when he was transferred to CCC on January 17, 2025, he was "the target of name calling, above normal searches, [j]eers, [and] harassment[.]" [doc. # 1, p. 4]. He states that he was "well known around the jail for being the lawsuit man because the spreading knowledge of the money [he] received from Tensas." [doc. # 5, p. 5]. He alleges that "shortly after the former case was settled[,]" staff denied the "smallest of request[s] . . . for things like toilet paper or bed linens . . . ." *Id.* Staff would instead tell him to buy the items because he had money. *Id.* Other prisoners would receive these items upon request. *Id.* He asserts that when he asked Ms. Bass[3]—who is Warden Bass's relative and who works in the commissary—about missing items in his orders, she would comment about Plaintiff "spending money [he did not] deserve and how they [were going to transfer him] as soon as [he] [gave] some of 'that money back.'" *Id.* He claims he was searched "on multiple occasions for no reason . . . ." *Id.*

On December 17, 2024, Plaintiff was placed in lockdown because Correctional Officer Ezell charged him with masturbating in view of Correctional Officer Dunmore. [doc. # 1, p. 4].

---

[3] Ms. Bass is not a defendant.

Plaintiff states that the charge was false and was retaliation for his prior lawsuit. [doc. #s 1, p. 4; 5, p. 5]. He alleges that later, on December 20, 2024, Defendant Dunmore apologized to him, stated that she knew he did not masturbate "to her," and stated that "she did nothing to stop the false accusation." [doc. # 5, p. 3]. He claims that because Dunmore apologized, she "was a part of the retaliation of some staff members." *Id.*

In lockdown, Plaintiff attempted to speak to Captain Smith. [doc. # 1, p. 5]. Captain Smith stated that he did not want to speak to Plaintiff. *Id.* When Plaintiff informed Smith that the charge against him was false, Smith warned Plaintiff that he would spray him in the mouth with mace if he did not "shut the fuck up[.]" *Id.* Plaintiff reiterated his innocence and stated that Smith did not want to listen to him. *Id.* Plaintiff claims that Smith, without cause, then sprayed him with mace on his face and directly in his left eye. *Id.* Plaintiff maintains that before Smith sprayed him, he did not pose a threat, was not being physically aggressive, was not causing a disturbance, and did not disobey a direct order. [doc. #s 1, p. 4; 5, p. 1]. After Smith sprayed him, Plaintiff struggled to breathe, his face burned and festered, and his eyes swelled and blistered. [doc. # 1, p. 5]. Plaintiff had access to a sink in his cell to wash his eyes, but the sink "barely had water flow" at the time. [doc. # 5, p. 7]. Plaintiff claims that Smith returned him to the contaminated cell and did not allow him to shower or clean the cell. *Id.*

"During the night," Plaintiff "declared a medical emergency to C.O. Sammy and Lt. Lundy[,]" who told him that "the day shift should have showered [him] and there was nothing she [sic] could do." [doc. # 1, p. 5]. He alleges that he told Lundy that he was maced and "had no property[,]" but Lundy did not allow him to shower or have a mattress or blanket and "allowed [him] to suffer through the night." [doc. # 5, pp. 3, 7]. Lundy allegedly stated that "the day shift should have showered [Plaintiff] and" given him a mattress and that "it wasn't her

responsibility to do so." *Id.* at 7.  Plaintiff told Lieutenant Clark that he needed to shower and clean his cell, but he claims that Clark ignored his request.  *Id.* at 6.  He "declared a medical emergency for [his] eyes to Lt. Cameron Bethel who told [him] that she was counting and left without returning."  [doc. # 1, pp. 5-6].  Minutes later, he asked Defendants T. Harvey, Davis, and Burks for care for his eyes, but they ignored him even after seeing the condition of his eyes.  [doc. # 1, p. 6].  Plaintiff claims that Defendant Neal was deliberately indifferent "when she didn't send [him] to medical" after he declared a medical emergency for his eyes.  [doc. # 5, p. 3].  Twenty-four hours passed, and he was not "given the opportunity to shower or clean" his cell.  [doc. # 1, p. 6].

On December 18, 2024, twenty-four hours after Smith sprayed Plaintiff with mace, Plaintiff told Smith that he had not showered or received his personal property, mattress, or a blanket.  [doc. # 1, p. 6].  When Smith told Plaintiff that he could obtain the items from "the officer who placed [him] on lockdown[,]" Plaintiff responded that he would not be able to wait two more days (when Lieutenant Clark was scheduled to return).  *Id.*  Smith then asked Plaintiff what he was "going to do about it" and told Plaintiff to "make sure to tell them (the federal court)" when he filed his lawsuit that Plaintiff liked to expose himself to women.  *Id.*  Plaintiff notes that up "to that point, [he] hadn't once mentioned suing anyone[,] which led" him to "know that a nefarious retaliation was at hand spearheaded by Warden Bass and his staff."  *Id.*  Plaintiff claims that he knew Smith was retaliating when he sprayed Plaintiff with mace the previous day because of Smith's later comment about filing a lawsuit in federal court.  [doc. # 5, p. 2].

"Less than two hours after the encounter with Captain Smith," Plaintiff told Defendant Bethel that he would not return to his cell without medical attention and without speaking to a ranking officer about not being able to shower.  [doc. # 1, pp. 6-7].  Bethel asked, "So you not

[sic] going back in your cell?"  *Id.* at 7.  Plaintiff responded, "No ma'am."  *Id.*  Plaintiff claims that Bethel then sprayed him with mace at "point blank range" while he was on his knees with his hands on his head, compliant, respectful, and not posing a threat.  [doc. #s 1, p. 7; 5, p. 6].  He had not been "given any verbal order to return to [his] cell."  [doc. # 1, p. 7].  Bethel then walked away, leaving Plaintiff on the floor.  [doc. # 5, p. 2]

"Minutes later Captain Smith responded[,]" saw Plaintiff sitting on the floor wiping mace from his eyes, and stated that he should mace Plaintiff in the mouth because Bethel "didn't do it right."  [doc. # 1, p. 7].  Smith handcuffed Plaintiff and escorted him to a "drunk cage."  *Id.*  There, "the mace began burning in earnest and [Plaintiff] fought for breath."  *Id.*  Nurse Harvey heard Plaintiff's complaints and "saw the condition of [his] eyes."  *Id.*  Plaintiff "declared a medical emergency[,]" and Nurse Harvey instructed Captain Smith to allow Plaintiff to "take a cold shower."  *Id.*  Plaintiff claims that Nurse Harvey was deliberately indifferent to his "medical emergency declaration for" his eyes after Bethel sprayed him with mace.  [doc. # 5, p. 4].  After Plaintiff showered, he received some of his personal property, a blanket, and a mattress.  *Id.*

Plaintiff faults Smith and Bethel for "reintroducing" him to a "contaminated cell after" they maced him.  [doc. # 5, p. 2].

Plaintiff states that on December 19, 2024, he "turned in a sick call to C.O. T. Harvey to get medical attention" for his eyes, and he was "told that [he] would be seen the next day on 12-20-24[,]" but he "wasn't seen" until January 3, 2025.  [doc. # 1, pp. 7-8].

Plaintiff requested caselaw from the law library on December 19, 2024.  [doc. # 1, p. 8].  He never received any "paperwork."  *Id.*  He "made this known in writing" and in person to Warden Bass and Captain Smith, but he never received "anything from the law library."  [doc. # 1, p. 8].

Also on December 19, 2024, a disciplinary board "headed by Captain Smith" sentenced Plaintiff to thirty days in lockdown.  [doc. # 1, p. 8].

On December 20, 2024, Plaintiff punched a steel sheet covering concrete and broke his right hand.  [doc. # 1, p. 8].  He claims that Defendants Dunmore and Brown did not return to him after he informed them of his injury.  *Id.* at 9.  Brown ignored Plaintiff and told him that he should not have punched the wall.  [doc. # 5, p. 4].  Dunmore allegedly saw Plaintiff break his hand, saw that his knuckle was in the middle of his hand, knew his hand was broken, but did not "take [him] to medical when [he] declared a medical emergency."  *Id.* at 3.  He also claims that Lieutenant Lundy failed to arrange medical care for his hand.  [doc. # 1, p. 9].  He alleges that Lundy saw his hand and acknowledged that it was broken, but she "did nothing to get [him] medical attention" and stated "there was nothing she could do because there was no one" to take him to a hospital.  [doc. # 5, p. 3].  He claims that Bethel saw the condition of his hand but failed to take him "to medical."  *Id.* at 2.  He claims that Burks was deliberately indifferent because she saw his broken hand and said that there was nothing she could do about it.  *Id.* at 3.  He claims that Neal saw his hand yet responded with deliberate indifference.  *Id.* at 3.  He claims that Officer Davis saw his broken hand yet did nothing.  *Id.*  He claims that T. Harvey was deliberately indifferent to his hand injury.  *Id.* at 4.  He claims that Defendant Clark denied him medical care even though Clark knew his hand was broken.  *Id.*

On December 21, 2024, Plaintiff asked Defendant Dunmore for medical care for his hand and eye, "but nothing was done."  [doc. # 1, p. 9].  Hours later, Defendant Neal escorted Plaintiff to a nurse, who arranged medical care for Plaintiff's hand.  *Id.*  Plaintiff received x-rays, a cast, a prescription for ibuprofen, and a splint at Franklin Medical Center.  *Id.*  He was diagnosed with a "fracture of the fifth metacarpal bone" on his right hand.  [doc. # 5, p. 8]. On discharge, he was

6

instructed to schedule an appointment "the upcoming week" because he "may require surgery by the orthopedic surgeon." [doc. # 1, pp. 9-10]. Plaintiff claims that the "appointment was never made" before he was transferred to CCC on January 17, 2025. *Id.* at 10. In an amended pleading, Plaintiff alleges that Warden Bass "didn't make sure that a medical order from the hospital was honored . . . ." [doc. # 5, p. 1].

On December 25, 2024, Plaintiff "reminded C.O. T. Harvey that [he] hadn't been seen by medical yet" and that he "continued to hurt and have blurred vision." [doc. # 1, p. 10].

On December 27, 2024, Plaintiff submitted "another medical request reminding medical that [he] hadn't been seen yet." [doc. # 1, p. 10]. On December 30, 2024, Plaintiff submitted a "request form with a handwritten letter to Warden Bass detailing everything contained in this complaint and all that had happened since coming to lockdown." [doc. # 1, p. 10].

On January 3, 2025, a nurse practitioner diagnosed Plaintiff with an eye infection and prescribed him ointment. [doc. #s 1, p. 10; 5, p. 8]. Plaintiff claims, "This injury is caused by the staff of Warden Bass and their deliberate indifference to my serious medical needs." [doc. # 1, p. 10].

Plaintiff claims that Warden Bass did not allow him to shower from January 4-9, 2025. [doc. #s 1, p. 10; 5, p. 1].

Plaintiff claims that from December 17, 2024, until January 8, 2025, he was not allowed to use the telephone, even though the warden allowed inmates in lockdown to use the telephone every other day. [doc. # 1, p. 11]. Plaintiff claims that this was "a part of the retaliation against [him] as well as cruel and unusual punishment." *Id.* He claims that Warden Bass, out of retaliation, allowed his staff to prohibit him from using the telephone. [doc. # 5, p. 1].

Plaintiff states that someone stole his money and property in lockdown. [doc. # 1, p. 11]. In an amended pleading, he claims that staff "allowed someone to access [his] commissary account and steal over $400 by transferring it to a phone account . . . ." [doc. # 5, p. 5].

Plaintiff claims: "Out of retaliation, Warden Nolan Bass purposely transferred me knowing full well that my money was missing and that I wouldn't stop my inquiries until I found out what was going on." [doc. # 1, p. 10].

Plaintiff claims that Warden Bass is "ultimately responsible for each of the violations of each staff member named in this complaint." [doc. # 5, p. 1]. He states that Bass was responsible for "any and all violations of [his] constitutional rights by staff under his direct authority." *Id.*

Plaintiff seeks monetary compensation and injunctive relief. [doc. # 1, p. 13].

## <u>Law and Analysis</u>

### 1. Preliminary Screening

Plaintiff is a prisoner who has been permitted to proceed in forma pauperis. As a prisoner seeking redress from an officer or employee of a governmental entity, his complaint is subject to preliminary screening pursuant to 28 U.S.C. § 1915A.[4] *See Martin v. Scott,* 156 F.3d 578, 579-80 (5th Cir. 1998) (*per curiam*). Because he is proceeding in forma pauperis, his Complaint is also subject to screening under § 1915(e)(2). Both § 1915(e)(2)(B) and § 1915A(b) provide for *sua sponte* dismissal of the complaint, or any portion thereof, if the Court finds it is frivolous or malicious, if it fails to state a claim on which relief may be granted, or if it seeks

---

[4] Under 28 U.S.C. § 1915(h), "'prisoner' means any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program."

monetary relief against a defendant who is immune from such relief.

A complaint is frivolous when it "lacks an arguable basis either in law or in fact." *Neitzke v. Williams,* 490 U.S. 319, 325 (1989). A claim lacks an arguable basis in law when it is "based on an indisputably meritless legal theory." *Id.* at 327. Courts are also afforded the unusual power to pierce the veil of the factual allegations and dismiss those claims whose factual contentions are clearly baseless. *Id.*

A complaint fails to state a claim on which relief may be granted when it fails to plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007); accord *Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009). A claim is facially plausible when it contains sufficient factual content for the court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 570). Plausibility does not equate to possibility or probability; it lies somewhere in between. *Id.* Plausibility simply calls for enough factual allegations to raise a reasonable expectation that discovery will reveal evidence to support the elements of the claim. *Twombly*, 550 U.S. at 556.

Assessing whether a complaint states a plausible claim for relief is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal, supra.* A well-pled complaint may proceed even if it strikes the court that actual proof of the asserted facts is improbable and that recovery is unlikely. *Twombly, supra*.

In making this determination, the court must assume that all of the plaintiff's factual allegations are true. *Bradley v. Puckett*, 157 F.3d 1022, 1025 (5th Cir. 1998). However, the same presumption does not extend to legal conclusions. *Iqbal, supra.* A pleading comprised of "labels and conclusions" or "a formulaic recitation of the elements of a cause of action" does not

satisfy Rule 8.  *Id.*  A complaint fails to state a claim where its factual allegations do not "raise a right to relief above the speculative level."  *Montoya v. FedEx Ground Package Sys., Inc.*, 614 F.3d 145, 148 (5th Cir. 2010) (*quoting Twombly*, 550 U.S. at 555).  "[U]nadorned, the-defendant unlawfully-harmed-me accusation[s]" will not suffice.  *Iqbal*, 556 U.S. at 677.

 "[P]laintiffs must allege facts that support the elements of the cause of action in order to make out a valid claim."  *City of Clinton, Ark. v. Pilgrim's Pride Corp*, 632 F.3d 148, 152-53 (5th Cir. 2010).  Courts are "not free to speculate that the plaintiff 'might' be able to state a claim if given yet another opportunity to add more facts to the complaint."  *Macias v. Raul A. (Unknown) Badge No. 153*, 23 F.3d 94, 97 (5th Cir. 1994).

A hearing need not be conducted for every pro se complaint.  *Wilson v. Barrientos*, 926 F.2d 480, 483 n.4 (5th Cir. 1991).  A district court may dismiss a prisoner's civil rights complaint as frivolous based upon the complaint and exhibits alone.  *Green v. McKaskle*, 788 F.2d 1116, 1120 (5th Cir. 1986).

"To state a section 1983 claim, a plaintiff must (1) allege a violation of a right secured by the Constitution or laws of the United States and (2) demonstrate that the alleged deprivation was committed by a person acting under color of state law."  *Whitley v. Hanna*, 726 F.3d 631, 638 (5th Cir. 2013) (internal quotation marks omitted).  Consistent with the standard above, a "[S]ection 1983 complaint must state specific facts, not simply legal and constitutional conclusions."  *Fee v. Herndon*, 900 F.2d 804, 807 (5th Cir. 1990).

**2. Excessive Force**

When a prison official is accused of using excessive physical force in contravention of the Eighth Amendment's Cruel and Unusual Punishments Clause, the core inquiry is "whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and

sadistically to cause harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (citing *Whitley v. Albers*, 475 U.S. 312, 320-21 (1986)). "Force beyond that reasonably required to maintain or restore discipline is 'wanton and unnecessary.'" *Perez v. Collier*, 2021 WL 4095263, at *2 (5th Cir. Sept. 8, 2021) (quoting *Hudson*, 503 U.S. at 7). "This standard looks to an official's subjective intent to punish." *Id.*

However, not every malevolent touch by a prison guard gives rise to a federal cause of action. *Hudson*, 503 U.S. at 9. The Eighth Amendment does not protect against "*de minimis*" use of physical force, so long as the use of force is not of a sort "repugnant to the conscience of mankind." *Id*. (citation and internal quotation marks omitted). Courts consider the following factors: (1) the extent of the injury suffered; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) the threat reasonably perceived by the responsible officials; and (5) any effort made to temper the severity of a forceful response. *Gomez v. Chandler*, 163 F.3d 921, 923 (5th Cir. 1999).

A. <u>Smith's Use of Force</u>

The Court should retain Plaintiff's excessive force claim against Captain Smith. In lockdown, Plaintiff attempted to speak to Captain Smith. [doc. # 1, p. 4]. Captain Smith stated that he did not want to speak. *Id.* When Plaintiff informed Smith that the charge against him was false, Smith warned Plaintiff that he would spray him in the mouth with mace if he did not "shut the fuck up[.]" *Id.* Plaintiff reiterated his innocence and stated that Smith did not want to listen to him. *Id.* Plaintiff claims that Smith, without cause, then sprayed him with mace on his face and directly in his left eye. *Id.* Plaintiff maintains that before Smith sprayed him, he did not pose a threat, was not being physically aggressive, was not causing a disturbance, and did not

disobey a direct order.  [doc. #s 1, p. 4; 5, p. 1].  After Smith sprayed him, Plaintiff struggled to

breathe, his face burned and festered, and his eyes swelled and blistered.  [doc. # 1, p. 5].

Plaintiff arguably suffered greater-than-de minimis injury.  He also plausibly alleges that

Smith had little need to use force because he was not a threat, was not causing a disturbance, and

did not disobey a direct order.  Absent warning Plaintiff once that he should refrain from

speaking, there is no indication that Smith tried to temper the severity of a forceful response.

Plaintiff does suggest that he disobeyed Smith's instruction to stop talking.  But construing

Plaintiff's allegations liberally and in his favor at this early stage of the proceeding, the Court

should retain this claim.

B. Bethel's Use of Force

Plaintiff claims that Lieutenant Bethel sprayed him with mace at "point blank range" even

though he was on his knees with his hands on his head, compliant, respectful, and not posing a

threat.  [doc. #s 1, p. 7; 5, p. 6].  He does suggest that Bethel indicated that he should he return to

his cell and that he disobeyed, but he states that Bethel never gave him a direct verbal order.  The

Court should retain this claim against Bethel.

**3. Medical Care**

To plead a constitutional violation of denial of medical care, a plaintiff "must

demonstrate that a government official was deliberately indifferent to 'a substantial risk of

serious medical harm.'"  *Bailey v. E. Baton Rouge Par. Prison*, 663 F. App'x 328, 330 (5th Cir.

2016) (quoting *Wagner v. Bay City*, 227 F.3d 316, 324 (5th Cir. 2000)).  A prison official acts

with deliberate indifference to an inmate's health "only if he knows that [the] inmate[ ] face[s] a

substantial risk of serious harm and disregards that risk by failing to take reasonable measures to

abate it."  *Farmer v. Brennan*, 511 U.S. 825, 847 (1994); *see Reeves v. Collins*, 27 F.3d 174,

176-77 (5th Cir. 1994) (applying *Farmer* to a denial of medical care claim).  A plaintiff must establish that a prison official "refused to treat him, ignored his complaints, intentionally treated him incorrectly, or engaged in any similar conduct that would clearly evince a wanton disregard for any serious medical needs."  *Gobert v. Caldwell*, 463 F.3d 339, 346 (5th Cir. 2006).

"[N]either an incorrect diagnosis nor the failure to alleviate a significant risk that should have been perceived, but was not, is sufficient to establish deliberate indifference."  *Blank v. Bell*, 634 F. App'x 445, 448 (5th Cir. 2016).  "Unsuccessful treatment, medical malpractice, and acts of negligence do not constitute deliberate indifference; nor does a prisoner's disagreement with his medical treatment, absent exceptional circumstances.  Moreover, a delay in treatment is not unconstitutional, unless there has been deliberate indifference that results in substantial harm. In short, [d]eliberate indifference is an extremely high standard to meet."  *Id.* (internal quotation marks and quoted sources omitted); *see Alton v. Tex. A & M Univ.*, 168 F.3d 196, 201 (5th Cir. 1999) ("Actions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference."); *Frazier v. Keith*, 707 F. App'x 823, 824 (5th Cir. 2018) ("The choice between forms of treatment is a classic example of a matter of professional judgment and does not support a finding of deliberate indifference.").

    A. <u>Decontamination After Smith Sprayed Plaintiff With Mace</u>

        i. <u>Defendant Smith</u>

Plaintiff plausibly alleges that he had a serious medical need for decontamination and that Smith was deliberately indifferent to a substantial risk of serious harm in failing to provide decontamination measures after spraying Plaintiff with mace.

Plaintiff did have access to a sink in his cell.  [doc. # 5, p. 7].  And the Fifth Circuit has stated that pepper spray "'[d]econtamination consists primarily of flushing the eyes with water.'"

*Hoke v. Anderson*, 799 F. App'x 224, 226 (5th Cir. 2020) (quoting *Wagner v. Bay City*, 227 F.3d 316, 319 n.1 (5th Cir. 2000)); *see Amos v. Jefferson*, 861 F. App'x 596, 602 (5th Cir. 2021) (noting that a nurse explained to a prisoner that the proper method to decontaminate after being sprayed with a chemical agent is to use running water, which was available in the prisoner's cell).[5]  However, Plaintiff states that the sink "barely had water flow" at the time.  The pleadings provide little indication of the extent to which he could use the water from the sink.  It is plausible—construing the allegations liberally and in Plaintiff's favor—that Plaintiff was unable to use the sink to decontaminate himself.

### ii. Lieutenant Clark, Lieutenant Bethel, and Officer Neal

Plaintiff writes that Lieutenant "Clark was the supervising officer on shift on 12-17-2024[.]"  [doc. # 5, p. 7].  He claims that he told Clark that he needed to shower and clean his cell, but Clark ignored his request.  *Id.*  He "declared a medical emergency for [his] eyes to Lt. Cameron Bethel who told [him] that she was counting and left without returning."  [doc. # 1, pp. 5-6].  Plaintiff claims that Defendant Neal was deliberately indifferent "when she didn't send [him] to medical" after he declared a medical emergency for his eyes.  [doc. # 5, p. 3].

---

[5] *See also Martin v. Seal*, 510 F. App'x 309, 315-16 (5th Cir. 2013) ("[A]fter each round of chemical treatment, they examined Martin, determined that he was not injured, and offered him a shower.  Such actions counter Martin's allegations of deliberate indifference."); *King v. City of Bossier City*, 2007 WL 1791215, at *4 (W.D. La. June 19, 2007) ("[T]o the extent plaintiff claims that he was provided inadequate medical care following the alleged multiple bursts of pepper spray . . . plaintiff was allowed to rinse out his eyes which shows that defendants were not deliberately indifferent . . . ."); *Ward v. Shaw*, 2015 WL 5712812, at *3 (S.D. Miss. Sept. 29, 2015) (finding no deliberate indifference where an inmate was allowed to shower twice after the administration of pepper spray, reasoning, "although his treatment may not have been the best that money can buy, this course of treatment did not demonstrate deliberate indifference to his medical needs."); *Hamilton v. Orr*, 2023 WL 2878820, at *4 (M.D. La. Mar. 22, 2023), *report and recommendation adopted,* 2023 WL 2868008 (M.D. La. Apr. 10, 2023) (finding that a nine-hour delay between when a prisoner was sprayed with a chemical agent and when he was allowed to shower did not state a claim of constitutional dimension).

The Court should dismiss these claims because Plaintiff does not allege that these defendants knew of his serious medical need and that they were aware Plaintiff was exposed to a substantial risk of serious harm.  Clark, according to Plaintiff's allegations, only knew that Plaintiff wanted a shower and a cleaner cell.  Bethel and Neal only knew that Plaintiff was declaring a medical emergency for his eyes.  He does not allege, for instance, that he told the defendants that he was recently sprayed with mace and had not showered.[6]  The undersigned could speculate that defendants viewed the condition of Plaintiff's eyes and that they therefore knew of  Plaintiff's condition and medical needs from his appearance alone, but Plaintiff is the master of his complaint, and he does not allege this.[7]

---

[6] *See Ford v. Anderson Cnty., Texas*, 102 F.4th 292, 317 (5th Cir. 2024) ("A singular denial of a request to see a doctor—absent more details that would unambiguously indicate a medical crisis—does not amount to deliberate indifference.").

[7] *See generally Rombach v. Culpepper*, 2021 WL 2944809, at *5 (5th Cir. July 13, 2021) (finding that no defendant knew the plaintiff was exposed to a substantial risk of serious harm where the plaintiff only told them that he "did not feel well and [that] he wanted to go to the hospital."); *Roberts v. Lessard*, 841 F. App'x 691 (5th Cir. 2021) (Correctional center guards were not subjectively aware that an inmate faced substantial risk of harm even though guards were aware that the inmate was displaying stroke symptoms; the inmate's symptoms, which included sweating, slurring speech, and trouble controlling movements, could also have suggested that he was intoxicated, and it was uncontested that guards believed the inmate was intoxicated); *Trevino v. Hinz*, 751 F. App'x 551, 556 (5th Cir. 2018) ("Plaintiffs' own allegations show that Trevino's symptoms were initially ambiguous, and that Officers Hauck and Hinz were therefore not unreasonable in believing she did not require immediate medical attention. Trevino vomited, had several shaking episodes, and told the officers she was sick.  None of these symptoms clearly indicated Trevino was undergoing an emergency necessitating immediate medical attention."); *Cleveland v. Bell*, 938 F.3d 672 (5th Cir. 2019) (noting that "actual knowledge is an essential element" and finding, where a nurse thought there was nothing wrong with Cleveland and believed he was faking illness, that the nurse did not draw the inference that Cleveland was experiencing a life-threatening medical emergency).

### iii. <u>Defendants T. Harvey, Davis, and Burks</u>

Plaintiff claims that he asked Defendants T. Harvey, Davis, and Burks for care for his eyes, but they ignored him.  [doc. # 1, p. 6].  Unlike his claims above against Bethel and Clark above, Plaintiff *does* allege that these defendants witnessed the condition of his eyes, which were blistered, swollen, and red.  *Id.*  Construing these allegations liberally in Plaintiff's favor, the Court should retain these claims against T. Harvey, Davis, and Burks.

### iv. <u>Defendant Lundy</u>

The Court should also retain Plaintiff's claim against Lundy.  Plaintiff "declared a medical emergency to C.O. Sammy and Lt. Lundy[,]" who told him that "the day shift should have showered [him] and there was nothing she [sic] could do."  [doc. # 1, p. 5].  He told Lundy that he was maced and "had no property[,]" but Lundy did not allow him to shower or have a mattress or blanket and "allowed [him] to suffer through the night."  [doc. # 5, pp. 3, 7].  Lundy allegedly stated that "the day shift should have showered [Plaintiff] and" given him a mattress and that "it wasn't her responsibility to do so."  *Id.* at 7.  Plaintiff, consequently, alleges that he had a serious medical need and that Lundy knew he was exposed to a substantial risk of serious harm absent decontamination measures.

## B. <u>Decontamination After Bethel Sprayed Plaintiff with Mace</u>

### i. <u>Defendants Bethel and Smith</u>

Plaintiff alleges that Bethel was deliberately indifferent to his serious need for decontamination after she sprayed him with mace.  After spraying him, she allegedly walked away, leaving him on the floor.  [doc. # 5, p. 2].  He also suggests that Smith was deliberately indifferent.  Minutes after Bethel sprayed him, Captain Smith responded, saw Plaintiff sitting on the floor wiping mace from his eyes, and stated that he should mace Plaintiff in the mouth

because Bethel "didn't do it right." [doc. # 1, p. 7]. Smith handcuffed Plaintiff and escorted him to a "drunk cage." *Id.*

As above, "a delay in treatment is not unconstitutional, unless there has been deliberate indifference that results in substantial harm." *Blank*, 634 F. App'x at 448. "[P]ain suffered during a delay in treatment can constitute a substantial harm . . . ." *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422 (5th Cir. 2017).

Plaintiff does *not* plausibly allege that any deliberate indifference and consequent delay in decontaminating him caused him substantial harm. After Bethel sprayed him, Smith responded in minutes and escorted him to a drunk cage in the front of the jail. [doc. # 1, p. 7]. Plaintiff states that this was when "the mace began burning in earnest and [he] fought for breath." *Id.* Then, Plaintiff received a shower at the behest of Nurse D. Harvey. *Id.* Even assuming (undoubtedly) that Plaintiff suffered pain between when Bethel sprayed him and when he showered, the pain during the minutes-long delay does not reflect substantial harm. *See Batyukova v. Doege*, 994 F.3d 717, 733 (5th Cir. 2021) ("We acknowledge that 15 minutes appears to be a long time to be left on the ground while bleeding from gunshot wounds. It does not, however, amount to a legally cognizable claim for deliberate indifference because Batyukova has not presented any evidence that the delay resulted in 'substantial harm.'").[8]

---

[8] *See also Huff v. Manfredi*, 504 F. App'x 342 (5th Cir. 2012) (inconsequential delays in treatment for the plaintiff's eye condition did not state a claim for relief); *Flores v. Jaramillo*, 389 F. App'x 393, 395-96 (5th Cir. 2010) ("Flores alleges an approximately twenty-minute delay between when she first complained of health problems and when EMS was called. . . . Flores has offered no evidence from which we can infer that the delay in treatment attributable to the officers caused substantial harm."); *Westfall v. Luna*, 903 F.3d 534, 551 (5th Cir. 2018) (finding, where the plaintiff was "moaning in pain during" a "half-hour delay in calling for medical assistance[,]" that the plaintiff suffered "no substantial harm" from the delay).

Moreover, because the delay was only minutes, it is not plausible that Plaintiff was exposed to a substantial risk of serious harm during the short delay. *See Rogers v. Jarrett*, 63 F.4th 971, 976 (5th Cir.), *cert. denied,* 144 S. Ct. 193 (2023) (opining that there was no substantial risk of serious harm where the plaintiff received medical aid within minutes after displaying severe symptoms).

The Court should dismiss these claims against Bethel and Smith.

     ii. <u>Nurse Harvey</u>

Plaintiff claims that Nurse Harvey was deliberately indifferent to his "medical emergency declaration for" his eyes after Bethel sprayed him with mace. [doc. # 5, p. 4].

Plaintiff does not plead a plausible constitutional violation. Nurse Harvey ordered Captain Smith to allow Plaintiff to "take a cold shower." [doc. # 1, p. 7]. Nurse Harvey did not refuse to treat Plaintiff, did not ignore any of his complaints, did not intentionally treat him incorrectly, and did not engage in any similar conduct that clearly evinced a wanton disregard for Plaintiff's serious medical needs. Even assuming Plaintiff was exposed to a substantial risk of serious harm (i.e., risk of eye damage due to the pepper spray), Plaintiff does not allege that Harvey actively disregarded that risk of harm.

As above, the Fifth Circuit has stated that pepper spray "'[d]econtamination consists primarily of flushing the eyes with water.'" *Hoke*, 799 F. App'x at 226; *see Amos*, 861 F. App'x at 602 (noting that a nurse explained to a prisoner that the proper method to decontaminate after being sprayed with a chemical agent is to use running water, which was available in the prisoner's cell).[9] The Court should dismiss this claim.

---

[9] *See supra*, note 5.

### iii. <u>Correctional Officer T. Harvey</u>

Plaintiff states that on December 19, 2024, he "turned in a sick call to C.O. T. Harvey to get medical attention" for his eyes, and he was "told that [he] would be seen the next day on 12-20-24[,]" but he "wasn't seen" until January 3, 2025.  [doc. # 1, pp. 7-8].  On December 25, 2024, Plaintiff "reminded C.O. T. Harvey that [he] hadn't been seen by medical yet" and that he "continued to hurt and have blurred vision."  [doc. # 1, p. 10].

Plaintiff, however, does not allege that T. Harvey was responsible for the delay in care.  He does not supply enough information to permit the Court to draw the reasonable inference that T. Harvey is liable for the misconduct alleged, and he does not plausibly plead deliberate indifference.[10]  *See Iqbal*, 556 U.S. at 678.  The Court should dismiss this claim.

### C. <u>Initial Medical Care for Plaintiff's Broken Hand</u>

On December 20, 2024, Plaintiff punched a steel sheet covering concrete and broke his right hand.  [doc. # 1, p. 8].  He claims that Defendants Dunmore and Brown did not return to him after he informed them of his injury.  *Id.* at 9.  He claims that Brown ignored him and told him that he should not have punched the wall.  [doc. # 5, p. 4].  Dunmore allegedly saw him break his hand, saw that his knuckle was in the middle of his hand, knew his hand was broken,

---

[10] *See Marshall v. Patel*, 317 F. App'x 395, 396 (5th Cir. 2009) (concluding that an inexplicable delay in receiving medication did not amount to deliberate indifference); *Garcia v. Fed. Bureau of Prisons*, 459 F. App'x 458, 459 (5th Cir. 2012) ("The fact of delay in itself is not sufficient to establish deliberate indifference. . . . [U]nexplained delays in dispensing medications constitute negligence at most."); *Broussard v. Nelson*, 503 F. App'x 259 (5th Cir. 2012) (holding, where the plaintiff alleged that a nurse failed to provide prescribed medication despite his repeated requests and failed to timely respond to his emergency call, that the plaintiff's "bare assertion" that the nurse delayed responding to his emergency call did not demonstrate deliberate indifference and did not "clearly evince" a "wanton disregard" for his medical needs); *Kelm v. Tigner*, 2020 WL 1490966, at *5 (W.D. La. Mar. 5, 2020), *report and recommendation adopted,* 2020 WL 1492548 (W.D. La. Mar. 26, 2020) ("Plaintiff simply alleges that 'nothing happened' after he requested care, which prompts the question, why did 'nothing' happen?").

but did not "take [him] to medical when [he] declared a medical emergency." *Id.* at 3. He claims that Lieutenant Lundy failed to arrange medical care for his hand. [doc. # 1, p. 9]. Lundy saw his hand and acknowledged that it was broken, but she "did nothing to get [him] medical attention" and stated "there was nothing she could do because there was no one" to take him to a hospital. [doc. # 5, p. 3]. He claims that Bethel saw the condition of his hand but failed to take him "to medical." *Id.* at 2. He claims that Burks was deliberately indifferent because she saw his broken hand and said that there was nothing she could do about it. *Id.* at 3. He claims that Neal saw his hand yet responded with deliberate indifference. *Id.* at 3. He claims that Officer Davis saw his broken hand and did nothing. *Id.* He claims that T. Harvey was deliberately indifferent to his hand injury. *Id.* at 4. Finally, he claims that Defendant Clark denied him medical care even though Clark knew his hand was broken. *Id.*

On December 21, 2024, Plaintiff asked Defendant Dunmore for medical care for his hand, "but nothing was done." [doc. # 1, p. 9]. Hours later, Defendant Neal escorted Plaintiff to a nurse, who arranged medical care. *Id.* Plaintiff received x-rays, a cast, a prescription for ibuprofen, and a splint at Franklin Medical Center. *Id.* He was diagnosed with a "fracture of the fifth metacarpal bone" on his right hand. [doc. # 5, p. 8].

As above, "a delay in treatment is not unconstitutional, unless there has been deliberate indifference that results in substantial harm." *Blank*, 634 F. App'x at 448. "[P]ain suffered during a delay in treatment can constitute a substantial harm . . . ." *Alderson*, 848 F.3d at 422.

While the undersigned is sympathetic to Plaintiff's plight, Plaintiff does not plead substantial harm resulting from the one-day delay in receiving medical care. Plaintiff does suggest that he suffered pain during the delay, but he does not describe sufficiently severe pain. *See Witt v. Bell*, 551 F. App'x 240, 241 (5th Cir. 2014) (finding no substantial harm where the

plaintiff broke his big toes, could ambulate without difficulty, and endured a two-week delay in getting an x-ray); *Badeaux v. St. Landry Par. Sheriff's Dep't*, 47 F.3d 425 (5th Cir. 1995) (finding no substantial harm where "no more than five days elapsed following Appellant's first request for medical treatment" for his knee and his treatment by a prison nurse, his care at hospitals, his pain medication, and his surgery).[11, 12] The Court should dismiss these claims.

---

[11] *Compare Bisby v. Garza*, 342 F. App'x 969, 971 (5th Cir. 2009) (finding that pain following a fall was not sufficiently severe during an hours-long delay in receiving an evaluation); *Westfall v. Luna*, 903 F.3d 534, 551 (5th Cir. 2018) (finding no claim where (1) the plaintiff's spinal injury was not "impacted" by a 30 to 45-minute delay in care and (2) no substantial harm occurred because the plaintiff did not detail the severity of her pain and alleged only that, during the delay, she was "moaning in pain."); *with Easter v. Powell*, 467 F.3d 459, 464 (5th Cir. 2006) (finding substantial harm where the plaintiff had a history of cardiac problems and endured *severe chest pains*, and the nurse responsible for the delay knew he had heart problems and lacked his heart medication); *Galvan v. Calhoun Cty.*, 719 F. App'x 372 (5th Cir. 2018) (holding that an inmate eventually diagnosed with calculus of gallbladder with acute cholecystitis, stated a claim where he alleged that prison officials failed for several days to answer his repeated requests to be taken to the hospital for pain "so severe that he thought he might die."); *Harris v. Hegmann*, 198 F.3d 153 (5th Cir. 1999) (finding a plausible claim where, following a failed procedure to remedy a broken jaw, the plaintiff's jaw was "rebroken" and he suffered constant *excruciating pain during the week-long delay* in treatment); *Alderson v. Concordia Par. Corr. Facility*, 848 F.3d 415, 422-23 (5th Cir. 2017) (finding, where an inmate was stabbed and stomped in an attack lasting three to five minutes, substantial harm because the inmate suffered a "tremendous amount of pain" during the over week-long delay); *Coleman v. Sweetin*, 745 F.3d 756, 765-66 (5th Cir. 2014) (finding substantial harm from a month-long delay where the plaintiff fell and "was in so much pain that he was unable to lie down in bed or use the toilet properly," pain overtook his entire body, he was "out of it" due to the pain, and doctors eventually inserted four pins and a plate during hip surgery).

[12] *See also Garrett v. Univ. of Texas Med. Branch*, 261 F. App'x 759, 760 (5th Cir. 2008) (finding, where the plaintiff suffered extreme pain from appendicitis, that he did not suffer "substantial harm as a result of the two-day delay."); *Harris v. Walley*, 436 F. App'x 372, 373 (5th Cir. 2011) (finding, where the plaintiff suffered "constant pain" from a year-long delay in surgery to remove several of his teeth, that he did not suffer substantial harm); *King v. Kilgore*, 98 F.3d 1338 (5th Cir. 1996) (finding, where the plaintiff alleged that the delay in care "prolonged his asthma attack and caused him pain, suffering, and discomfort[,]" that even though "an asthma attack is a serious and potentially deadly problem," the plaintiff did not suffer "substantial harm due to the delay.").

D. <u>Appointment With a Specialist For Broken Hand</u>

On discharge from the hospital, Plaintiff was instructed to schedule an appointment "the upcoming week" for his broken hand because he "may require surgery by the orthopedic surgeon." [doc. # 1, pp. 9-10]. Plaintiff claims that the "appointment was never made" before he was transferred to CCC on January 17, 2025. *Id.* at 10. In an amended pleading, Plaintiff alleges that Warden Bass "didn't make sure that a medical order from the hospital was honored . . . ." [doc. # 5, p. 1]. Presumably, Plaintiff is alleging that Bass did not ensure that he received an appointment with an orthopedic surgeon within four weeks after he received care at the hospital (i.e., from December 21, 2024, to January 17, 2025, when he was transferred to a different facility).

Plaintiff does not plausibly allege that Bass was deliberately indifferent to a substantial risk of serious harm because he does not allege that Bass knew of the instruction from the hospital to schedule the appointment. At best, Plaintiff alleges that on December 30, 2024, he submitted a "request form with a handwritten letter to Warden Bass detailing everything contained in this complaint and all that had happened since coming to lockdown." [doc. # 1, p. 10]. Even assuming this overarching letter detailed his medical needs and the instruction to schedule an appointment with a specialist, Plaintiff does not allege that Bass ever received, read, reviewed, and denied his request; consequently, he does not allege that Bass was personally involved in failing to provide the care he sought, and he does not plausibly allege that Bass knew of a substantial risk of serious harm. *See Ball v. LeBlanc*, 792 F.3d 584, 595 (5th Cir. 2015) ("[A] prison administrator who has received an administrative remedy request is not necessarily made aware, without factual corroboration, that there is a substantial risk of serious harm."); *Ornelas v. Hamilton*, 2021 WL 4618465, at *2 (5th Cir. Oct. 6, 2021) (finding that a defendant

was not aware of an excessive risk to the plaintiff where the plaintiff alleged that he sent letters to the defendant reporting abuse and asking for help because there was no allegation that the defendant saw or received the letters).

In addition, Plaintiff does not plausibly allege that he was exposed to a substantial risk of serious harm during the 27-day delay—from when he was discharged from the hospital to when he was transferred to a different facility—in receiving an appointment.  Even non-incarcerated individuals with full insurance must often wait months to see a specialist, depending on the locale, specialists' schedules, the number of available specialists, and demand. *See White v. Rader*, 2010 WL 1744652, at *4 (M.D. La. Mar. 29, 2010), *report and recommendation adopted,* 2010 WL 1737139 (M.D. La. Apr. 28, 2010) ("[I]t is recognized that even persons who are not confined in penal institutions must" endure delays before obtaining appointments with chosen physicians).  Moreover, to the extent Plaintiff claims he did not receive 'follow up' care, complaints of not receiving follow-up examinations do "not rise to the level of deliberate indifference." *Mathis v. Alexander*, 49 F.3d 728 (5th Cir. 1995).  The Court should dismiss this claim.

E. <u>Eye Infection</u>

On January 3, 2025, a nurse practitioner diagnosed Plaintiff with an eye infection and prescribed him ointment.  [doc. #s 1, p. 10; 5, p. 8].  Plaintiff claims, "This injury is caused by the staff of Warden Bass and their deliberate indifference to my serious medical needs." [doc. # 1, p. 10].

Federal Rule of Civil Procedure 17(b)(3) provides that the "[c]apacity to sue or be sued is determined . . . by the law of the state where the court is located . . . ."  Under Louisiana law, an entity must qualify as a "juridical person," which is an "entity to which the law attributes

personality, such as a corporation or a partnership." La. Civ. Code art. 24. Here, "staff" does not qualify as a juridical person. *See Henderson v. Mid States Servs., Inc.*, 67 F. App'x 247 (5th Cir. 2003) (finding that the plaintiff did not show "that the Medical Department is a legal entity amenable to suit . . . .").

Moreover, "Deliberate indifference [] cannot be shown through the actions of the cumulative group." *Martinez v. City of N. Richland Hills*, 846 F. App'x 238, 243 (5th Cir. 2021). "The court disregards bare assertions of collective responsibility, unsupported by concrete factual allegations." *Id.* The Court should dismiss this claim.

## 4. Conditions of Confinement

"While the Constitution does not require that custodial inmates be housed in comfortable prisons, the Eighth Amendment's prohibition against cruel and unusual punishment does require that prisoners be afforded 'humane conditions of confinement' and prison officials are to ensure that inmates receive adequate food, shelter, clothing, and medical care." *Herman v. Holiday*, 238 F.3d 660, 664 (5th Cir. 2001) (quoting *Farmer v. Brennan*, 511 U.S. 825 (1994)). To establish an Eighth Amendment violation, a prisoner must demonstrate that a prison official was deliberately indifferent to conditions that resulted in the "extreme deprivation[,]" *Shannon v. Vannoy*, 682 F. App'x 283, 285 (5th Cir. 2017), of the "minimal civilized measure of life's necessities." *Hernandez v. Velasquez*, 522 F.3d 556, 560 (5th Cir. 2008). To establish deliberate indifference, the prisoner must show that the official knew of and disregarded an excessive risk to inmate health or safety; the official must have been both aware of facts from the inference could be drawn that a substantial risk of serious harm exists, and he must have drawn the inference. *Farmer*, 511 U.S. at 837.

"*Some* conditions of confinement may establish an Eighth Amendment violation in combination when each would not do so alone, but only when they have a mutually enforcing effect that produces the deprivation of a single, identifiable human need such as food, warmth, or exercise—for example, a low cell temperature at night combined with a failure to issue blankets." *Wilson v. Seiter*, 501 U.S. 294, 304 (1991) (internal quotation marks and quoted source omitted). However, "Nothing so amorphous as 'overall conditions' can rise to the level of cruel and unusual punishment when no specific deprivation of a single human need exists." *Id.* at 305.

A. <u>Returning Plaintiff to the Cell in Which He Was Maced</u>

Plaintiff claims that Smith sprayed him with mace in his cell on December 17, 2024. Plaintiff claims that Smith returned him to the cell without removing/sanitizing the mace.  [doc. # 1, p. 5].  Bethel sprayed Plaintiff with mace on December 28, 2024, outside of the cell. Plaintiff does not specify whether any mace entered his cell after Bethel sprayed him.  He claims that after he showered and received personal property, a blanket, and a mattress, Smith and Bethel returned him to the contaminated, mace-filled cell without giving him "the opportunity to sanitize or clean it."  [doc. #s 1, p. 7; 5, pp. 2, 4].

 Construing these allegations liberally and in his favor, Plaintiff states plausible claims on which relief may be granted.  *See Cardona v. Taylor*, 828 F. App'x 198, 202 (5th Cir. 2020) (officers ordered the plaintiff back into his cell which was still filled with tear gas, refused to provide supplies for decontamination, denied him an opportunity to go to a medical department for treatment of injuries and exposure to tear gas, and declined to house him in a cell free of tear gas); *Hope v. Harris*, 861 F. App'x 571, 584 (5th Cir. 2021) (a prisoner was exposed to pepper spray and tear gas in his cell "at least ten times through no fault of his own," his cell was not

decontaminated, and on one occasion he was "left nude in a cell with the pepper spray still on his body [without anything] to clean it off with for eight days."). The Court should retain these claims.

B. Lack of Personal Property, a Blanket, and a Mattress

Plaintiff claims that the night of December 17, 2024, after Smith sprayed him with mace, he lacked his personal property, a blanket, and a mattress. He alleges that he told Defendant Lundy that he "had no property[,]" but Lundy did not allow him to have a mattress or blanket and "allowed [him] to suffer through the night." [doc. # 5, pp. 3, 7]. Lundy allegedly stated that "the day shift should have" given him a mattress and that "it wasn't her responsibility to do so." *Id.* at 7. On December 18, 2024, Plaintiff told Smith that he had not received his personal property, mattress, or a blanket. [doc. # 1, p. 6]. When Smith told Plaintiff that he could obtain the items from "the officer who placed [him] on lockdown[,]" Plaintiff responded that he would not be able to wait two more days for that officer to return. *Id.* Plaintiff was, however, able to obtain a blanket from his cellmate. [doc. # 1, p. 6]. Later on December 18, Plaintiff received some of his personal property, a blanket, and a mattress.

 Plaintiff does not state a constitutional claim. He does not plausibly allege that he endured an extreme deprivation of any life necessity because he lacked these items for one night. *See Hope v. Harris*, 861 F. App'x 571, 583 (5th Cir. 2021) ("[A]lthough Hope also generally alleges excessive noise and sleep deprivation, . . . it is not clear if the alleged noise is serious enough to cause sleep deprivation or how much sleep Hope actually gets. Without such allegations, Hope has not alleged that he 'has been deprived of the minimal measure of life's necessities.'"). Nor does Plaintiff plausibly allege that he was exposed to a substantial risk of serious harm because he lacked these items. Lacking a mattress and a blanket for one night

could deprive one of sleep or warmth and thereby expose one to harm, but the deprivation of sleep and/or warmth for one night is not, absent more, extreme and does not expose one to a *substantial* risk of *serious* harm.[13]  The undersigned is sympathetic to Plaintiff's plight and does not condone the defendants' alleged actions (or inaction), but ultimately he does not plausibly allege the type of "'cold hearted, casual unwillingness to investigate what can be done for a man who is obviously in desperate need of help'" that the Fifth Circuit has "recognized as necessary to constitute deliberate indifference." *See Davis v. Lithicum*, 574 F. App'x 379, 380 (5th Cir. 2014).  The Court should dismiss this claim.

C. Showers

Plaintiff claims that Warden Bass did not allow him to shower for five days.  [doc. #s 1, p. 10; 5, p. 1].

This claim could implicate a need to maintain adequate hygiene and health.  Speculation aside, Plaintiff does not allege that this condition deprived him of any identifiable life need. Even if he did, the duration does not reflect an extreme deprivation, and Plaintiff fails to allege

---

[13] *See Jarvis v. Hall*, 2023 WL 3818377, at *4 (5th Cir. June 5, 2023) (opining, where the plaintiff lacked clothing, bedding, and personal hygiene items for 3-7 days, that, *inter alia*, the "temporary deprivations" were not extreme "in light of their short duration.") (citing *Novak v. Beto*, 453 F.2d 661, 665-66, 69 (5th Cir. 1971) (short-term solitary confinement without full bedding was not severe); *Hamilton v. Lyons*, 74 F.3d 99, 106 n.8 (5th Cir. 1996) (short-term lack of showers and sheets was not severe); *see also Grissom v. Davis*, 55 Fed. Appx. 756, 758 (6th Cir. 2003) (seven days without mattress, sheets, or blanket was not a deprivation of basic human needs and did not cause serious harm); *O'Leary v. Iowa State Men's Reformatory*, 79 F.3d 82, 84 (8th Cir.1996) (sleeping with no mattress or blanket for four days on a concrete slab in a cell located 10 feet from an exterior door during winter did not deny plaintiff the minimal civilized measures of life's necessities); *Seltzer-Bey v. Delo*, 66 F.3d 961, 964 (8th Cir.1995) (placement in a cell without clothes, running water, a mattress or a blanket for two days was not unconstitutional when the inmate did not suffer any injury or adverse health consequences).

that the conditions exposed him to a substantial risk of serious harm.[14]  *See Brumley v. Livingston*, 459 F. App'x 470, 472 (5th Cir. 2012) (affirming dismissal of a plaintiff's claim that he was denied showers "because he failed to properly allege that he was subjected to a substantial risk of harm.").  The Court should dismiss this claim.

D. Lack of a Telephone

Plaintiff claims that from December 17, 2024, until January 8, 2025, he was not allowed to use the telephone, even though the warden allowed other inmates in lockdown to use the telephone every other day.  [doc. # 1, p. 11].  Plaintiff claims that Warden Bass allowed his staff to prohibit Plaintiff from using the telephone.  [doc. # 5, p. 1].

Plaintiff does not state that the condition deprived him of any need.  He does not describe an extreme deprivation of, for example, a need for social contact.  Moreover, he does not allege that he has been unable to contact, for instance, family or his lawyer.  He also does not allege that he lacked social interaction with others within the facility, and the interaction of which he was allegedly deprived continued only approximately three weeks.  This deprivation was not, objectively, sufficiently serious.

Nor does Plaintiff allege that lacking a telephone for twenty-two days exposed him to a substantial risk of serious harm.  The Court should dismiss this claim.  *See Hill v. Estelle*, 537

---

[14] *See Holloway v. Gunnell*, 685 F.2d 150, 156 (5th Cir. 1982) (citing with tacit approval several courts' opinions that "one or two showers a week is sufficient to satisfy constitutional requirements."); *Hamilton v. Lyons*, 74 F.3d 99, 106 (5th Cir. 1996) (finding the denial of showers for a three-day period de minimis); *McAllister v. Strain*, 2009 WL 500560, at *2 (E.D. La. Feb. 25, 2009)  (denying a claim of no showers for seven days); *Simpson v. Epps*, 2010 WL 3724546, at *6 (S.D. Miss. Sept. 15, 2010) (six days); *Carter v. Strain*, 2009 WL 3231826, at *2 (E.D. La. Oct.1, 2009) (eight days); *c.f. Bradley*, 157 F.3d at 1025 (finding that a plaintiff stated a claim when he alleged that he was unable to bathe for several months, that he was forced to clean himself with toilet water, and that the unhygienic conditions resulted in a fungal infection requiring medical attention).

F.2d 214, 215 (5th Cir. 1976) (dismissing a claim where the plaintiffs did not complain of an "inability to communicate with courts, counsel, or their families and friends" because "regulations pertaining to making phone calls . . . do not constitute an abuse of the discretion enjoyed by prison authorities."); *McDowell v. Litz*, 419 F. App'x 149 (3d Cir. 2011) (a 90-day suspension of telephone privileges neither represented a dramatic departure from accepted standards for conditions of confinement nor deprived the prisoner of basic necessities).

## 5. Access to Court

Plaintiff requested caselaw from the law library concerning "what was going on with" him. [doc. # 1, p. 8]. He never received any "paperwork." *Id.* He "made this known in writing" and in person to Warden Bass and Captain Smith, but he never received "anything from the law library."

To succeed on a claimed denial of access to courts, a plaintiff must show that he lost an actionable claim or was prevented from presenting such a claim because of the alleged denial. *Lewis v. Casey*, 518 U.S. 343, 356 (1996); *Eason v. Thaler*, 73 F.3d 1322, 1328 (5th Cir. 1996) (holding that to state a claim of denial of access to the courts, a plaintiff must demonstrate that his position as a litigant was prejudiced as a direct result of the denial of access). "[T]he complaint should state the underlying claim in accordance with Federal Rule of Civil Procedure 8(a), just as if it were being independently pursued, and a like plain statement should describe any remedy available under the access claim and presently unique to it." *Christopher v. Harbury*, 536 U.S. 403, 417-18 (2002).

The "injury requirement is not satisfied by just any type of frustrated legal claim." *Lewis*, 518 U.S. at 353. Rather, a plaintiff must demonstrate that the lack of access prevented him from filing or caused him to lose a case that attacks either his conviction or seeks "to vindicate 'basic

constitutional rights'" in a civil rights action.  *Id.* at 353-54 (quoting *Wolff v. McDonnell*, 418 U.S. 539, 579 (1974)).

"Denial-of-access claims take one of two forms: forward-looking claims alleging 'that systemic official action frustrates a plaintiff or plaintiff class in preparing and filing suits at the present time,' and backward-looking claims alleging that an official action has 'caused the loss or inadequate settlement of a meritorious case, the loss of an opportunity to sue, or the loss of an opportunity to seek some particular order of relief.'" *Waller v. Hanlon*, 922 F.3d 590, 601 (5th Cir. 2019) (quoting *Christopher*, 536 U.S. at 413-14).

 "To maintain a backward-looking claim, a plaintiff must identify (1) a nonfrivolous underlying claim; (2) an official act that frustrated the litigation of that claim; and (3) a remedy that is not otherwise available in another suit that may yet be brought."  *United States v. McRae*, 702 F.3d 806, 830-31 (5th Cir. 2012); *see Christopher*, 536 U.S. at 413-14 (("These cases do not look forward to a class of future litigation, but backward to a time when specific litigation ended poorly, or could not have commenced, or could have produced a remedy subsequently unobtainable.").

With respect to the inability to access a library or a claim that a library was deficient, an inmate must "demonstrate that the alleged shortcomings in the library or legal assistance program hindered his efforts to pursue a legal claim." *Lewis*, 518 U.S. at 351.  "He might show, for example, that a complaint he prepared was dismissed for failure to satisfy some technical requirement which, because of deficiencies in the prison's legal assistance facilities, he could not have known.  Or that he had suffered arguably actionable harm that he wished to bring before the courts, but was so stymied by inadequacies of the law library that he was unable even to file a complaint."  *Id.*  "[A]n inmate cannot establish relevant actual injury simply by establishing that

30

his prison's law library or legal assistance program is subpar in some theoretical sense." *Id.* The "inmate must show that a nonfrivolous, arguable claim he wished to bring has been lost or rejected due to the deficiency or that the deficiency is currently preventing his presentation of such a claim." *Sanchez v. Stephens*, 689 F. App'x 797, 799 (5th Cir. 2017).

Here, Plaintiff appears to present a 'backward-looking claim,' suggesting that he lacked case law concerning the issues he raises in this proceeding. But Plaintiff does not identify any specific, non-frivolous legal claim that he could not raise because of defendants' actions, that he raised and lost, or for which he could not obtain a remedy. *See Sanchez*, 689 F. App'x at 799 ("His assertions that he has been hindered in presenting claims challenging his criminal conviction and prison disciplinary cases are conclusory. He fails to describe the claims with the particularity needed to evaluate whether they were nonfrivolous and does not explain with specificity how the absence of legal materials and assistance in Spanish actually hindered those claims."). In addition, Plaintiff does not allege how access to case law from the law library would have aided him in this proceeding, "how he would have proceeded with access to a law library," what specific cases or law he would have cited if he had access to the law library, "or how [his] claims would have been meritorious." *See Hopkins v. Ogg*, 2019 WL 3761360, at *3 (5th Cir. Aug. 8, 2019). He does not demonstrate that any alleged lack of case law hindered his efforts to pursue a legal claim. *See Lewis*, 518 U.S. at 351. Ultimately, Plaintiff does not demonstrate that his position as a litigant was prejudiced as a direct result of the denial of access to case law.

To the extent Plaintiff claims that his lack of access to the library affected his ability to research any claims he raises here, "there is no constitutional right to 'be able to conduct generalized research.'" *Douthit v. Dean*, 568 F. App'x 336, 337 (5th Cir. 2014) (quoting *Lewis*,

518 U.S. at 351) (reasoning that the plaintiff's "motion alleged that the library's deficiencies would cause immediate harm to his case, [but] he did not specify how the case would be harmed. For example, he did not allege that he was unable to draft an adequate complaint or other pleading without the missing volumes."). There is no "abstract, freestanding right to a law library or legal assistance." *Lewis*, 518 U.S. at 351.

The Court should dismiss these claims.

**6. Retaliation**

Plaintiff claims that defendants at TPDC retaliated against him because of a previous lawsuit he filed against officials at TPDC, including Warden Bass and Nurse D. Harvey. *See Preston, Jr., supra.* In the previous lawsuit, the Court, *inter alia*, dismissed Plaintiff's claims against Bass but retained Plaintiff's claims against Nurse Harvey. Plaintiff later settled his claims against Nurse Harvey on October 8, 2024.

To prevail on a retaliation claim, a plaintiff must prove: (1) the exercise of a specific constitutional right; (2) the defendants' intent to retaliate for the exercise of that right; (3) a retaliatory adverse act; and (4) causation, which in this context means that but for the retaliatory motive, the complained of incident would not have occurred. *McDonald v. Steward*, 132 F.3d 225, 2331 (5th Cir. 1998). Courts must "carefully scrutinize" retaliation claims to "assure that prisoners do not inappropriately insulate themselves from disciplinary actions by drawing the shield of retaliation around them." *Woods v. Smith*, 60 F.3d 1161, 1166 (5th Cir. 1995). The standard "places a significant burden on an inmate as the court must regard claims of retaliation

with skepticism." *DeMarco v. Davis*, 914 F.3d 383, 388 (5th Cir. 2019) (quotation marks and quoted source omitted).[15]

A plaintiff must produce direct evidence of motivation or allege a chronology of events from which retaliation may be plausibly inferred. *Woods v. Smith*, 60 F.3d 1161 (5th Cir. 1995). "Mere conclusory allegations of retaliation are insufficient[,] . . . a plaintiff must allege more than his personal belief that he has been the victim of retaliation." *Jones v. Greninger*, 188 F.3d 322, 325 (5th Cir. 1999). With respect to the third prong above, "Retaliation against a prisoner is actionable only if it is capable of deterring a person of ordinary firmness from further exercising his constitutional rights." *Smith v. Hebert*, 533 F. App'x 479, 482 (5th Cir. 2013).

A. Name Calling, Searches, Jeers, and Harassment

Plaintiff claims that from when he settled his prior lawsuit to when he was transferred to CCC on January 17, 2025, he was "the target of name calling, above normal searches, [j]eers, [and] harassment[.]" [doc. # 1, p. 4]. He claims he was searched "on multiple occasions for no reason . . . ." He does not, however, name a defendant responsible for these actions. The Court should dismiss this claim.

B. Staff

Plaintiff alleges that "shortly after the former case was settled[,]" staff denied the "smallest of request[s] . . . for things like toilet paper or bed linens . . . ." [doc. # 5, p. 5]. Staff would instead tell him to buy the items because he had money. *Id.* He also claims that Warden Bass conspired with staff to retaliate.

---

[15] "The prospect of endless claims of retaliation on the part of inmates would disrupt prison officials in the discharge of their most basic duties. Claims of retaliation must therefore be regarded with skepticism, lest federal courts embroil themselves in every disciplinary act that occurs in state penal institutions." *Id.* (quoting *Adams v. Rice*, 40 F.3d 72, 74 (4th Cir. 1994)).

The Court should dismiss these claims against "staff" because, as explained above, staff does not qualify as a juridical person.

C. <u>Ms. Bass</u>

Plaintiff asserts that when he asked Ms. Bass—who is Warden Bass's relative and who works in the commissary—about missing items in his orders, she commented about Plaintiff "spending money [he did not] deserve and how they [were going to transfer him] as soon as [he] [gave] some of 'that money back.'" Plaintiff, however, does not name Ms. Bass as a defendant, and he does not identify any named defendant responsible for these actions. Thus, the Court should dismiss this ostensible claim.

D. <u>Officer Ezell</u>

Plaintiff states that Officer Ezell falsely charged him with a sex offense in retaliation for his prior lawsuit. [doc. # 1, p. 4]. But Plaintiff does not name Ezell as a defendant. The Court should dismiss this ostensible claim.

E. <u>Captain Smith</u>

Plaintiff suggests that Smith sprayed him with mace on December 17, 2024, in retaliation for the prior lawsuit Plaintiff settled on October 17, 2024. For context, the undersigned presents Plaintiff's claim verbatim:

> The way I knew that it was a retaliation on his part was when he told me to tell them (federal courts) that I like to show my penis (He used the word 'dick') to women when I file my lawsuit. At that point I hadn't even mentioned suing anyone nor did I afterward. I never tell anyone I'm going to sue them before or during the process.

[doc. # 5, p. 2].

At bottom, Plaintiff's claim is impermissibly speculative. Plaintiff does not explicitly allege that Smith sprayed him with mace *because* Plaintiff settled a lawsuit over two months

earlier against Warden Bass and Nurse Harvey.  And he does not produce (or allege) direct evidence of motivation.  Smith's stray comment about filing a federal lawsuit, which he uttered a day after spraying Plaintiff with mace, was, under Plaintiff's allegations, in response to Plaintiff's request for a shower, his personal property, his mattress, and a blanket (i.e., not in response to spraying Plaintiff with mace).  [doc. # 1, p. 6].  In addition, the comment is not connected to Plaintiff's prior lawsuit (which he filed on approximately March 9, 2023, well over one year before Smith sprayed him with mace).  At best, Smith's comment appears to be in response to Plaintiff allegedly exposing himself to Officer Dunmore.

Nor does Plaintiff allege a chronology of events from which retaliation may be plausibly inferred.  Plaintiff filed his prior lawsuit on approximately March 9, 2023.  He settled the lawsuit on approximately October 8, 2024.  Smith sprayed Plaintiff with mace on December 17, 2024, over one year after Plaintiff filed the prior lawsuit and over two months after Plaintiff settled the lawsuit.  This does not reflect a "tight chain of events" between the predicate events and the alleged retaliatory acts.  *Compare Johnson v. Collier*, 854 F. App'x 621, 622 (5th Cir. 2021) (finding, where the plaintiff alleged that the defendant retaliated "a year" after the plaintiff named the defendant in a prior lawsuit, that "[t]he gap in time between Johnson's filing of that suit and the allegedly retaliatory transfer is too great to support an inference of causation on its own."); *with Petzold v. Rostollan*, 946 F.3d 242, 253 (5th Cir. 2019) (finding that less than an hour and even up to a month was a chronology of events from which retaliation could be inferred).[16]

---

[16] *See also Trevino v. Gutierrez*, 426 F. App'x 327, 330 (5th Cir. 2011) ("[T]he mere fact that an undesirable action occurred after a long history of filing grievances against Moore does not suffice to raise a plausible claim of retaliation."); *Cardenas v. Young*, 655 F. App'x 183, 185-86 (5th Cir. 2016) ("[T]he only complaints Cardenas made about government officials and witnesses were made in or around September or October of 2012, five to six months before he was placed

Moreover, he does not allege that Smith was even aware of his prior lawsuit (to which Smith was not a party).[17] At best, Plaintiff mentions elsewhere in his pleading that he was "well known around the jail for being the lawsuit man because the spreading knowledge of the money [he] received from Tensas." [doc. # 5, p. 5]. Plaintiff's "personal belief that he was the victim of retaliation is not sufficient to support a retaliation claim." *Davis v. Young*, 624 F. App'x 203, 206 (5th Cir. 2015); *see Hines v. Texas*, 76 F. App'x 564, 567 (5th Cir. 2003) ("At best, the allegations in Hines's complaint show only that Hines has a subjective belief that he has been retaliated against because of his litigiousness.").

The Court should dismiss this claim.

F. Nurse Harvey

Plaintiff claims that Nurse Harvey was "also a part of the retaliation staff because she was the named defendant in [his] previous case . . . ." [doc. # 5, p. 4]. Plaintiff does not identify the alleged retaliatory act. Rather, he sets forth a bald, formulaic cause of action. This claim is impermissibly conclusory; the Court should dismiss it.[18] *See Jones v. Hosemann*, 2020 WL

---

in segregation, and after he was placed in segregation. Thus, retaliation cannot be plausibly inferred from the chronology of events alleged by Cardenas, and Cardenas's retaliation claim alleges nothing more than Cardenas's personal belief that he is the victim of retaliation.").

[17] *See Hale v. Williams*, 390 F. App'x 351, 352 (5th Cir. 2010) (finding no triable issue concerning a retaliatory motive because the defendant was "was not even aware of" the plaintiff's act for which he claimed defendant retaliated); *Armenta v. Pryor*, 377 F. App'x 413, 416 (5th Cir. 2010) (finding no chronology of events where the plaintiff's "grievances were filed months before the alleged retaliatory act and" the plaintiff provided "no evidence that any of the Defendants were named in, or had any knowledge of, his prior grievances or his lawsuit."); *Baughman v. Seale*, 761 F. App'x 371, 382 (5th Cir. 2019), *cert. denied,* 140 S. Ct. 1142 (2020); *Mark v. Spears*, 2023 WL 5316554, at *5 (5th Cir. Aug. 17, 2023).

[18] It appears that after setting forth a non-retaliation claim against almost every defendant, Plaintiff then baldly labels the defendant's action or inaction retaliation, attempting to pad his claims and set forth an additional cause of action without differentiating the underlying claim from the retaliation claim.

3250038, at *4 (5th Cir. June 15, 2020) ("But all Jones alleges is that the individual defendants acted with 'pretext' and 'in retaliation.'  Those are purely legal conclusions.").

    G. <u>Warden Bass</u>

    Plaintiff claims that from December 17, 2024, until January 8, 2025, Warden Bass would not allow him to use the telephone.  He claims that this was "a part of the retaliation against [him] as well as cruel and unusual punishment."  The alleged retaliatory action is, however, de minimis: lacking a telephone for twenty-two days does not, absent more, constitute an act which would deter a person of ordinary firmness from further exercising his constitutional rights.[19]  The Court should dismiss this claim.

    Next, Plaintiff claims: "Out of retaliation, Warden Nolan Bass purposely transferred me knowing full well that my money was missing and that I wouldn't stop my inquiries until I found out what was going on."  [doc. # 1, p. 10].  Plaintiff does not plausibly allege a retaliatory adverse act.  "[A] claim that an inmate was transferred to a more dangerous prison in retaliation for an exercise of a constitutional right will support a Section 1983 claim."  *Ward v. Fisher*, 616 F. App'x 680, 684 (5th Cir. 2015).  But Plaintiff does not allege that CCC is more dangerous than, or inferior to, TPDC.  Moreover, he does not allege that the transfer rendered him unable to pursue his lost funds; rather, he states that he will not stop pursuing his funds and that he will find "out what was going on."  The Court should dismiss this claim.

---

[19] *See Petzold v. Rostollan*, 946 F.3d 242, 254 (5th Cir. 2019) (concluding allegedly retaliatory actions were de minimis because the inmate suffered no "serious consequences"); *see generally Weeks v. Collier*, 2023 WL 7703823, at *7 (5th Cir. Nov. 15, 2023) (holding that confiscation "of Tylenol and soap would not deter an ordinary person from pursuing his claims"); *Mark v. Spears*, 2023 WL 5316554, at *6 (5th Cir. Aug. 17, 2023) (finding, where an officer "coughed up phlegm and spit it" in the plaintiff's food, that the act was de minimis).

Finally, Plaintiff suggests that all or almost all defendants were engaged in a wide-ranging conspiracy, orchestrated by Bass, to retaliate against him for his prior lawsuit. However, Plaintiff's ostensible claim is devoid of detail. Mere "conclusory allegations of conspiracy cannot, absent reference to material facts, state a substantial claim of federal conspiracy." *McAfee v. 5th Circuit Judges,* 884 F.2d 221, 222 (5th Cir. 1989) (internal quotation marks and citation omitted). Moreover, Plaintiff does not allege that the defendants agreed to retaliate against him. *See Leggett v. Comer*, 280 F. App'x 333, 336 (5th Cir. 2008) (finding that the plaintiff had no conspiracy claim where he did not allege that defendants had an agreement to retaliate). The Court should dismiss this claim.

## 7. Stolen Money and Property

Plaintiff states that in lockdown, someone stole his money and property. [doc. # 1, p. 11]. In an amended pleading, he claims that staff "allowed someone to access [his] commissary account and steal over $400 by transferring it to a phone account . . . ." [doc. # 5, p. 5].

To reiterate, "staff" is not a juridical entity amenable to suit. Thus, the Court should dismiss this claim.

## 8. Supervisory Liability

Plaintiff claims that Warden Bass is "ultimately responsible for each of the violations of each staff member named in this complaint." [doc. # 5, p. 1]. He states that Bass did nothing to correct Plaintiff's mistreatment by staff and "was responsible for any and all violations of [his] constitutional rights by staff under his direct authority." *Id.*

"Supervisory officials may be held liable only if: (i) they affirmatively participate in acts that cause constitutional deprivations; or (ii) implement unconstitutional policies that causally result in plaintiff's injuries." *Mouille v. City of Live Oak, Tex.*, 977 F.2d 924, 929 (5th Cir. 1992).

"Vicarious liability does not apply to § 1983 claims." *Pierce v. Texas Dept. of Crim. Justice, Inst. Div.*, 37 F.3d 1146, 1150 (5th Cir. 1994). "'[A] plaintiff must show either [that] the supervisor personally was involved in the constitutional violation or that there is a sufficient causal connection between the supervisor's conduct and the constitutional violation.'" *Brown v. Taylor*, 911 F.3d 235, 245 (5th Cir. 2018) (quoting *Evett v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 330 F.3d 681, 689 (5th Cir. 2003)).

Here, Plaintiff does not allege that Bass affirmatively participated in any act that caused a constitutional deprivation or that there was a sufficient causal connection between their conduct and any alleged constitutional violation.[20] Instead, Plaintiff pleads only vicarious liability, essentially naming Bass as a defendant (for this claim) solely because of the position or title Bass holds. *See Thompkins v. Belt*, 828 F.2d 298, 305 (5th Cir. 1987) ("[M]isconduct of Sheriff Belt's employees cannot be imputed to the sheriff individually . . . .").

Nor does Plaintiff allege that Bass implemented an unconstitutional policy, practice, custom, or procedure that deprived him of any constitutional right. *See Lentworth v. Potter*, 255 F. App'x 903, 905 (5th Cir. 2007) (opining, where the plaintiff alleged that the defendant failed to "take corrective action" as to subordinates' acts, that the plaintiff did not allege that the supervisors were personally involved in the acts or implemented an unconstitutional policy).

Accordingly, the Court should dismiss this claim.

---

[20] *See Dedrick v. Richards*, 47 F.3d 425 (5th Cir. 1995) ("An official who is sued in her individual capacity cannot be liable under § 1983 on the theory of *respondeat superior;* to be liable she must have been personally involved in the plaintiff's injury."); *Salcido v. Univ. of S. Mississippi*, 557 F. App'x 289, 292 (5th Cir. 2014) ("To make out a § 1983 claim against the Defendants in their individual capacities, Salcido must show that they were either personally involved in the constitutional violations alleged or that their wrongful actions were causally connected to the constitutional deprivation.").

**9. Injunctive Relief**

"Under Article III of the Constitution, federal courts may adjudicate only actual, ongoing cases or controversies." *Lewis v. Continental Bank Corp.*, 494 U.S. 472, 477 (1990). "[A] case is moot when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Powell v. McCormack*, 395 U.S. 486, 496 (1969); *Rocky v. King*, 900 F.2d 864, 867 (5th Cir. 1990). Litigants "must have suffered, or be threatened with, an actual injury traceable to the defendant and likely to be redressed by a favorable judicial decision." *Spencer v. Kemna*, 523 U.S. 1, 7 (1998) (internal quotation and citation omitted).

"This case-or-controversy requirement persists through all stages of federal judicial proceedings." *Dierlam v. Trump*, 977 F.3d 471, 476 (5th Cir. 2020). "If an intervening event renders the court unable to grant the litigant any effectual relief whatever, the case is moot." *Id.* "A claim for declaratory and injunctive relief based on conditions of confinement is rendered moot upon the prisoner's release or transfer from the facility." *Smith v. City of Tupelo, Mississippi*, 281 F. App'x 279, 282 (5th Cir. 2008).

Mootness is jurisdictional and must be raised sua sponte. *Bailey v. Southerland*, 821 F.2d 277, 278 (5th Cir. 1987).

Here, because Plaintiff is no longer incarcerated at TPDC, his requests for injunctive relief are moot.[21] *See Herman v. Holiday*, 238 F.3d 660, 665 (5th Cir. 2001) (determining that an inmate's transfer to a different unit rendered claims for declaratory and injunctive relief moot); *Lee v. Richland Par. Det. Ctr.*, 483 F. App'x 904 (5th Cir. 2012) (affirming that a detainee's

---

[21] Plaintiff does not allege or suggest, and the record does not reveal, that there is a reasonable, demonstrable probability that he will return to TPDC. *See Hardwick v. Brinson*, 523 F.2d 798, 800 (5th Cir. 1975); *Murphy v. Hunt*, 455 U.S. 478, 482 (1982).

request for injunctive relief was moot because the detainee was no longer housed at the detention

center).  The Court should therefore dismiss Plaintiff's requests for injunctive relief.

<u>Recommendation</u>

For the reasons above, **IT IS RECOMMENDED** that the following be **DISMISSED**

**WITH PREJUDICE** for failing to state claims on which relief may be granted: (1) Plaintiff

Frederick Charles Preston, Jr.'s claims that Clark, Bethel, and Neal failed to provide

decontamination measures after Smith sprayed Plaintiff with mace; (2) that Bethel and Smith

failed to provide decontamination measures after Bethel sprayed Plaintiff with mace; (3) that

Nurse Harvey and Officer T. Harvey failed to provide medical care after Bethel sprayed

Plaintiff; (4) that Dunmore, Brown, Lundy, Bethel, Burks, Neal, Davis, T. Harvey, and Clark

failed to provide initial medical care for Plaintiff's hand after he punched a wall; (5) that Warden

Bass failed to make an appointment with a specialist for Plaintiff's broken hand; (6) that

Plaintiff's eye infection was caused by a lack of medical care; (7) that Lundy and Smith failed to

give Plaintiff his personal property, a blanket, and a mattress; (8) that Bass did not allow Plaintiff

to shower and prohibited him from using a telephone; (9) Plaintiff's retaliation claims; (10)

Plaintiff's claim that staff allowed someone to steal his money; and (11) that Bass did not correct

the staff's mistreatment of Plaintiff.

IT IS FURTHER RECOMMENDED that Plaintiff's requests for injunctive relief be

**DISMISSED WITHOUT PREJUDICE**.

Under the provisions of 28 U.S.C. § 636(b)(1)(C) and Rule 72(b), parties aggrieved by

this recommendation have **fourteen (14) days** from service of this Report and Recommendation

to file specific, written objections with the Clerk of Court.  A party may respond to another

party's objections within **fourteen (14) days** after being served with a copy of any objections or

response to the district judge at the time of filing.

**Failure to file written objections to the proposed factual findings and/or the proposed legal conclusions reflected in this Report and Recommendation within fourteen (14) days following the date of its service, or within the time frame authorized by Fed. R. Civ. P. 6(b), shall bar an aggrieved party from attacking either the factual findings or the legal conclusions accepted by the District Court, except upon grounds of plain error.** ***See Douglass v. United Services Automobile Association*, 79 F.3d 1415 (5th Cir. 1996).**

In Chambers, Monroe, Louisiana, this 15th day of May, 2025.

Kayla Dye McClusky
United States Magistrate Judge